Beatrice Shainswit, J.
The centerpiece of our entire legal system is a fair and orderly trial, capped by a verdict arrived at on the basis of evidence received in a calm and rational courtroom environment. Fortunately, this describes the overwhelming preponderance of cases that go to trial. In this case, however, there was an onslaught on normal courtroom procedures; the question here is whether justice survived that onslaught.
Whether the trial that was conducted before this court and a jury can fairly be treated as a trial arises against the backdrop of two matters to be resolved by the court: (1) a post-verdict motion by plaintiff, pursuant to subdivision (a) of CPLR 4404, to set aside a verdict in favor of defendants as contrary to the weight of the evidence; and (2) the execution of a criminal contempt mandate against defendants’ counsel.
If all that were involved was the basically routine consideration of a motion to set aside a verdict as against the weight of the evidence, the course of judicial decision would have been so clear and so unmistakable as to permit prompt disposition without reservation. This court is a firm believer in the jury system. Here, where the factual issues were so sharply divergent, the issue of credibility so paramount, and where the evidence could have supported a jury verdict either way, we had a classic case for jury disposition with finality.
But, unfortunately, disposition of the post-verdict motion is not so simple. Subdivision (a) of CPLR 4404 also lodges in the court discretion to set aside a verdict “ in the interest of justice.” The critical question, against the backdrop of what actually transpired in the courtroom, is whether a fair trial was prevented in this case, and the verdict thereby tainted, by the actions of one Walter Gr. Alton, Jr., an associate of the firm representing defendant doctors. A cold transcript of the trial, startling as it may read, could scarcely reproduce the courtroom atmosphere engendered by Mr. Alton’s tactics — disruption, confusion and hysteria seemed to be his calculated objective. In over 20 years as a courtroom lawyer and Judge, I have never witnessed such a spectacle:
The duty of the court is to assess the total conduct of the trial, and to determine if the resulting verdict might have been affected by the unworthy performance of counsel. My concern, in other words, is whether the. jury was permitted to perform its function in a proper fashion and ip the interest of justice.
*803 To start at the beginning: This was a wrongful death action for malpractice, brought against four doctors. Plaintiff alleged that his wife’s death of cervical cancer was due to defendants’ departure from accepted medical standards, in failing to properly and timely diagnose and treat her condition. The action against two of the doctors was dismissed at the end of plaintiff’s case, and a verdict for the other two was returned by the jury.
From the first moment of this trial — indeed, from before the jury was selected — the normal trial procedures were disturbed by defendants’ counsel, who was hostile, hysterical, insolent and abusive to the court, and whose constant shrieking engulfed the courtroom. Initially, the court was concerned that Dole v. Dow Chem. Co. (30 N Y 2d 143 [1972]) might have placed defendants’ counsel in an equivocal position in representing three of the four doctors being sued. Counsel admitted that his clients had not been advised of their right to apportionment, in case of a plaintiff’s verdict, under the Dole case. The court promptly directed that they be so advised, and that they come forward and state to the court whether they chose to have separate individual counsel, or to knowingly waive their rights under Dole. For three days the trial was delayed while counsel flatly refused to produce the clients. It was only when the court indicated that it was prepared to disqualify the firm with which Mr. Alton was associated that its mandate was finally obeyed and defense counsel protected against its own possible violation of the Canons of Ethics.
This original issue apparently inflamed Mr. Alton — he threw it up to the court on more than one occasion subsequently. It became the triggering mechanism for enveloping the courtroom in an atmosphere of hysteria and screaming — at plaintiff himself, at plaintiff’s counsel, and at the court. There were constant interruptions of the proceedings, deluges of objections, refusals to be seated on the court’s instructions, long harangues on every objection, self-righteous quarrels with the court’s decisions, and on two occasions open laughter at the court’s rulings — all in the presence of the jury.
Beyond this, counsel indulged himself in frequent lengthy attacks on the court’s integrity and fairness, plus reiterated charges that the court was prejudiced against his clients. And, with ad nauseam repetitiveness, whenever the court tried to bring order to the courtroom, and to permit the jury to receive the evidence in a calm and rational manner, defense counsel sought to capitalize on his own behavior by moving for a mis *804 trial — thereby confronting the court with the dilemma of unduly punishing plaintiff (and, for that matter, even defendants themselves) for defense counsel’s actions.
In short, the obvious intention was to create an atmosphere of such confusion, uncertainty, and anger as to make it impossible for the jury to perform its function of receiving and deliberating over the evidence in the tranquility ordered justice requires. The court tried to grapple with this pattern of behavior by frequent recesses and warnings, outside the presence of the jury. Innumerable conferences were held, in an effort to route counsel to the path of lawyerlike responsibility. The result was simply even greater hysteria and insolence. Apparently, Mr. Alton thought it would advantage him before the jury if he posed as a wounded warrior ringed by hostility and unfairness.
When all else failed, the court was finally compelled to issue a mandate of criminal contempt, fining counsel $250. The court made the appropriate formal determination and findings, pursuant to section 750 of the Judiciary Law. Before preparing the formal mandate, the court noted on the record: “The Court’s ears are still ringing with your latest abusive tirade, and I am increasingly concerned that the jury is being equally deafened by the abusive tirades and a fair trial is being imperiled by your unworthy behavior. I have given you previous warnings; and in fact on a previous warning to all counsel, the other counsel have been courteous ever since, and considerate, and have abided by my instructions.”
Enforcement of the mandate was of course stayed, in order not to disrupt the trial still further, and in the hope that the outstanding mandate might have some effect on defense counsel. It did, to an extent — although his conduct continued offensive, it was considerably scaled down, and the chaos that had threatened to flood the proceeding was stemmed.
The trial itself, once the jury was selected, took a full two weeks, and was bitterly contested, with a sharp division of expert testimony. In my charge, I carefully admonished the jury not to be swayed by the hostility engendered by the bickering of counsel.
The guideline for post-verdict decision is by now well established : the court has the power to set aside a verdict where the actions of counsel have so disrupted or poisoned orderly trial procedures as to render a just verdict impossible. (Flamm v. Noble, 274 App. Div. 1037 [1st Dept., 1949]; Nieves v. City of New York, 277 App. Div. 357 [1st Dept., 1950]; Kohlmann *805 v. City of New York, 8 A D 2d 598 [1st Dept., 1959]; Kavazanjian v. Brookhatten Trucking Co., 20 Misc 2d 780 [Sup. Ct., Nassau County, 1959], affd. sub nom. Kavazanjian v. Bowne-Morton Stores, 10 A D 2d 949 [2d Dept., 1960]; Cohon & Co. v. Pennsylvania Coal & Coke Corp., 10 A D 2d 667 [1st Dept., 1960]; Zaulich v. Thompkins Sq. Holding Co., 10 A D 2d 492, 497 [1st Dept., 1960]; Novins v. Sklar, 15 A D 2d 822 [2d Dept., 1962].)
In short, there is abundant authority authorizing the vacatur of the verdict if the court were persuaded that the verdict may have been a product of the unworthy tactics which punctuated the trial. However, after thoroughly reviewing the record, and having noted the demeanor and general attitude of the jury — which listened most intently all through the trial, and then was out deliberating for two days, in the course of which it returned with rather perceptive requests — I am satisfied that my instructions were heeded, The jury, I am convinced, performed its task with fairness and thoroughness. Without going into the many hundreds of pages of evidence, I find that there was more than enough to sustain the verdict for defendants. I am satisfied that the verdict was reached rationally. Indeed, it is a tribute to the jury system that the obvious efforts here to confuse and disrupt failed to prevent the careful, lengthy deliberation that resulted in the verdict.
I am therefore constrained to deny plaintiff’s motion. I have written this opinion to serve as a caveat. Although in this case I find that counsel’s antics did not, on balance, imperil the verdict by influencing this jury, the opposite might very easily be true in the next case he tries, if he duplicates his past behavior.
In light of my foregoing finding that the verdict was untainted, and because of the consequences to a lawyer of guilt of criminal contempt, I am revoking and nullifying my order and mandate, as an act of grace. Since in this case its immediate purpose was accomplished — it had a salutary effect (albeit limited) on counsel’s conduct, and thus helped achieve the ordered atmosphere in which the jury was ultimately able to deliberate rationally — I am hopeful that the warning alone, without further action, may have a similar permanent impact on counsel’s conduct in general.
I have served my time with Mr. Alton. If in some measure this opinion may spare my judicial brethren exposure to a repetition of his circus-like behavior and operatic taunts, my servitude at hard, judicial labor will not have been in vain.